UNITED STATES of America,
Plaintiff-Appellee,

v.

George V. H. KLEIFGEN,
Defendant-Appellant.

No. 76–3231.

United States Court of Appeals,
Ninth Circuit.

July 20, 1977.

Kermitt L. Waters, Las Vegas, Nev., argued for appellant.

Phillip M. Pro, Asst. U. S. Atty., Las Vegas, Nev., argued for appellee. ·

Before GOODWIN and SNEED, Circuit Judges, and HILL,* District Judge.

SNEED, Circuit Judge:

Appellant George V. H. Kleifgen, who is *no stranger to this court,*[1] was in this case convicted of four counts of wilful attempt to evade and defeat income tax due for the four-year period commencing January 1, 1969, and ending December 31, 1972, in violation of 26 U.S.C. § 7201. To obtain a reversal of this conviction he relies on five contentions. These are that (1) the trial court erred in refusing to dismiss the indictment because the grand jury was unlawfully empaneled; (2) the unauthorized interview by the prosecution of his former counsel violated his Fifth and Sixth Amendment rights; (3) he was entitled to a judgment of acquittal; (4) exclusion of evidence indicative of a decline in his net worth was error; and (5) the jury instruction concerning certain embezzlement losses was prejudicial. We will address these contentions in order; when necessary our discussion of each will be supplemented by the relevant facts.

## I.

### *Challenge to the Grand Jury.*

Understanding of the appellant's first contention begins with the Jury Selection Act of 1968, 28 U.S.C. § 1861 et seq. (Act), which declares that "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. To further the objectives of this provision, 28 U.S.C. § 1863 directs the district court to formulate a plan for random jury selection.[2] The plan may provide for selection of prospective jurors on the basis of voter registration lists; these lists are to be supplemented, however, if necessary to foster the policy of section 1861. 28 U.S.C. § 1863(b)(2). A substantial failure to comply with the provisions of the Act enables a defendant to seek in a timely fashion a dismissal of the indictment or a stay of the proceedings against him. 28 U.S.C. § 1867(a).

In accordance with the grand jury selection plan promulgated pursuant to 28 U.S.C. § 1863, the United States District Court for the District of Nevada (Southern Division) used names randomly selected from voter registration lists as the exclusive source of potential jurors.[3] Appellant contends that his indictment by a grand jury so selected should have been dismissed under section 1867(a) because this method violated both the Fifth Amendment and 28 U.S.C. § 1861 by not insuring that the grand jury would be chosen from a fair cross section of the community.[4] Voter registration lists, he insists, should have been supplemented under section 1863(b)(2) to remedy this de-

* Honorable Irving Hill, United States District Judge for the Central District of California, sitting by designation.

1. We affirmed appellant's conviction for making false statements to the Social Security Administration in requesting payment for medical services rendered to Medicare recipients in violation of 18 U.S.C. § 1001. *United States v. Kleifgen,* No. 73–3179 (9th Cir. July 17, 1975).

2. Section 1863 also requires the jury selection plan to foster the objectives of section 1862, which prohibits exclusion from the grand or petit jury on account of "race, color, religion, sex, national origin, or economic status."

3. This case was transferred for trial from the Southern Division to the Northern Division of the District of Nevada on motion of defendant.

4. In denying appellant's motion to dismiss the indictment, the district court held that such a motion under section 1867 is appropriate only if the grand jury was not drawn in conformity with an approved selection plan. Under the district court's reasoning, a challenge to the plan itself must be presented in a proceeding to amend the plan. In light of our decision with respect to the merits of appellant's challenge to the plan, we need not and do not offer any opinion as to the propriety of this holding of the district court.

fect. In support of this position, appellant cites a demographic study which shows varying degrees of underrepresentation in the voter registration lists of five groups—blacks, males, non-high school graduates, non-working people and the young.

As this circuit recently made clear, appellant in order to prevail must prove that the exclusive use of voter registration lists resulted in a substantial underrepresentation in the jury pool of a cognizable group in the community. *United States v. Potter*, 552 F.2d 901 (9th Cir. 1977). *See also United States v. DiTommaso*, 405 F.2d 385 (4th Cir. 1968), *cert. denied*, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969). He has failed in this task.[5] Of the five groups which appellant argues are underrepresented, *Potter* instructs us that only two of these groups—blacks and males—are cognizable groups. Neither of these, moreover, was substantially underrepresented. Under *Potter* neither young people nor less educated people comprise a cognizable group. Neither "in some objectively discernible and significant way, is distinct from the rest of society." *United States v. Potter*, 552 F.2d at 904. These groups have no internal cohesion nor are they viewed as an identifiable class by the general populace. Moreover, their members have diverse attitudes and characteristics which defy classification. The same can be said for the unemployed. Therefore, we hold that neither non-high school graduates,

non-working people, nor the young are cognizable classes.[6]

Blacks and males, however, are cognizable classes within the community. *See Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946); *United States v. Potter, supra.* Appellant's demographic evidence[7] indicated that for the years studied blacks comprised 7% of the total population but only 5.1% of the jury list and that males comprised 50.9% of the total population but only 46.5% of the jury list. It is this underrepresentation which is at the heart of appellant's contention that he was deprived of the right to a grand jury chosen from a fair cross section of the community.

Neither the Constitution nor the Act, however, requires the grand jury to duplicate precisely the statistical complexion of the community. *Hoyt v. Florida*, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961); *United States v. Potter, supra.* Some deviation from the statistical structure of the community is to be expected. Only when this deviation becomes substantial is a defendant deprived of his right to be judged by a grand jury chosen from a fair cross section of the community. In the absence of substantial underrepresentation there is no necessity to supplement voter registration lists.[8]

Appellant, employing the same technique as did appellant in *Potter*, interprets his

---

**5.** Our holding with respect to the questions of cognizability and substantiality of any deviation makes it unnecessary to decide whether a defendant, in attacking on statutory grounds a grand jury which was drawn solely from voter registration lists, must show that certain groups have been inhibited from registering to vote or that the district court purposefully discriminated against certain groups in creating the jury pool. *Cf. United States v. Ross*, 468 F.2d 1213 (9th Cir. 1972). Nor is it necessary that we decide whether such a showing is necessary to support a constitutional attack based on the Fifth Amendment right to a grand jury.

**6.** Appellant also asserts that the undereducated and the unemployed are likely to be in lower economic groups than the rest of the population and that therefore they comprise cogniza-

ble classes based on economic status. We disagree. Lack of education or employment is by no means synonymous with lack of wealth.

**7.** The government does not challenge the numerical accuracy of this study.

**8.** The Legislative History of the Jury Selection Act indicates that

The voting list need not perfectly mirror the percentage structure of the community. But any substantial percentage deviations must be corrected by the use of supplemental sources.

H.R. #1076 1968 U.S.Code Cong. & Admin. News, Vol. 2, pp. 1792, 1794.

statistical data to show blacks and males to be underrepresented by 27% and 9% respectively. This interpretation, as pointed out in *Potter*, 552 F.2d at 906, exaggerates the effect of any deviation. To avoid this exaggeration, we adopted a test for substantiality which judges the effect of any deviation not in terms of percentages but in terms of its impact on the absolute numerical composition of the grand jury. *United States v. Potter, supra; United States v. Armsbury*, 408 F.Supp. 1130 (D.Or.1976). *Cf. Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 52 L.Ed.2d 498 (1977). That is, to determine substantiality we look to *people* not *percentages.*

■ Blacks and males, it is true, are underrepresented in an absolute sense by 2.9% and 4.4% respectively. Looking only at people, however, it is also true that in an array of 100 jurors, the absolute numerical effect of the underrepresentation of blacks and males would be that the array would include 2.9 fewer blacks and 4.4 fewer males. A grand jury of 23 drawn from this array on the average would underrepresent blacks by less than one juror and males by approximately one juror. This is not substantial underrepresentation. The district court, therefore, did not err in denying appellant's motion to dismiss the indictment.

## II.

### *Interview with Former Counsel.*

Appellant's second contention presents a somewhat more difficult issue. Prior to the trial of the case, the United States Attorney interviewed Henry Gordon, appellant's former counsel. Gordon had represented appellant in a prosecution for inflated medicare claims and in previous settlement proceedings with the Internal Revenue Service. Appellant argues that by interviewing his former counsel without the presence of his current counsel the government violated his rights to counsel and a fair trial under the

Sixth Amendment and his right to due process under the Fifth Amendment.

■ Confidential communications had between appellant and his former counsel retain the protection of the attorney-client privilege beyond the termination of the attorney-client relationship. 8 J. Wigmore, Evidence § 2323 (McNaughton rev. 1961). EC 4–6, ABA Code of Professional Responsibility (1975). Governmental intrusion into this protected area can deprive a defendant of Fifth and Sixth Amendment rights. *United States v. Zarzour*, 432 F.2d 1 (5th Cir. 1970); *Caldwell v. United States*, 92 U.S.App.D.C. 355, 205 F.2d 879 (1953). Our difficulty springs from the fact that the record before us discloses neither the circumstances leading up to the interview nor what transpired therein. Absent this factual foundation, we cannot determine if privileged communications were disclosed and, if so, what harm ensued. We must, therefore, remand these questions to the district court for an evidentiary hearing thereon.

## III.

### *Sufficiency of the Evidence.*

Appellant next contends that the evidence conclusively established that no taxes were due and that consequently his motion for acquittal should have been granted. Although appellant employed the cash method of accounting in preparing his returns prior to 1969, he disagrees with the government's use of the cash method and insists that the accrual method, which according to his calculations demonstrates that there was no tax liability, better reflects his income for the four-year period.

■ There are two difficulties with the appellant's argument. The first is that the taxpayer cannot abandon the cash method without obtaining the consent of the Commissioner. I.R.C. § 446(e).[9] This he has not done. The second is that even if the accrual method were available, its use would eliminate all taxes due only if certain deductions, which in the main consisted of

---

**9.** The Commissioner's consent to a change in accounting methods is required regardless of whether the change is from one proper method to another proper method or from an improper method to a proper one. *Witte v. Commissioner*, 168 U.S.App.D.C. 133, 513 F.2d 391 (1975). *See* Treas.Reg. § 1.446–1(e)(2).

embezzlement losses and reserves for contingent liabilities,[10] are valid. These deductions, however, are not proper. As we shall point out, the embezzlement losses under the facts of this case were not allowable for the year in which they were discovered, *see* Part V, *infra*. Moreover, sums set aside to cover contingent liabilities were not deductible because all the events which fix the amount and the fact of appellant's liability did not occur in the year for which the deductions were claimed. *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516, 519, 64 S.Ct. 364, 88 L.Ed. 270 (1944); *cf. Lutz v. Commissioner*, 396 F.2d 412 (9th Cir. 1968). In addition, the evidence revealed other significant shortcomings in appellant's proof with respect to tax liability, for example, the failure to include appellant's cash receipts in his gross income. We conclude that the jury justifiably rejected appellant's calculations showing the absence of any tax liability.

Assertions of deductions improper under any method of accounting and other deficiencies in appellant's proof of tax liability do not demonstrate that the cash method of accounting does not clearly reflect income. Quite the contrary is the case. It strengthens the government's contention that the cash method does clearly reflect income. We so hold.

 In addition, in its case in chief, the government presented strong evidence indicating that appellant had incurred substantial tax liability for each year in the period of 1969–1972. Viewing this evidence in the light most favorable to the government, *United States v. Nelson*, 419 F.2d 1237 (9th Cir. 1969), we find that the verdict has sufficient evidentiary support.

### IV.

### Exclusion of Proof of Net Worth.

 Appellant, to buttress his contention that he had no taxable income for this period, attempted to introduce evidence of a decline in his net worth over the four-year period. Proof of a change in net worth is relevant to the determination of taxable income only if there is an accurate opening net worth against which to measure any change. *See Holland v. United States*, 348 U.S. 121, 132, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The trial court found that the evidence here did not establish a sufficiently accurate starting point. We agree.

 Appellant's proof of a change in net worth was inadequate for a second reason. In calculating the change in net worth, the taxpayer's non-deductible expenditures must be added to his closing net worth. *Holland v. United States*, 348 U.S. at 125, 75 S.Ct. 127. No evidence of the amount of appellant's non-deductible expenditures was offered; thus any estimation of a change in his net worth was pure conjecture. Exclusion of the evidence which was offered by the appellant was not error.

### V.

### Embezzlement Loss Instruction.

Turning finally to appellant's complaint regarding the embezzlement loss instruction we see that the trial court gave the following instruction:

Business losses due to embezzlement of funds by defendant's employees are deductible from gross income in the year in which the embezzlement is discovered. If, however, the evidence shows to your satisfaction that the funds, if any, so embezzled were taken from the defendant's income receipts which should have been reported as part of defendant's gross income for Federal Income Tax computations in the year received, and that they were not so reported, then no deduction for an embezzlement loss is allowable.

---

**10.** In 1973 appellant allegedly set aside in trust $200,000 to cover malpractice claims incurred in 1969–1972, $50,000 for the defense of a criminal charge for certain activity in 1971, and $140,000 for legal fees to be incurred in the defense of this case.

Appellant argues that this instruction was erroneous in that (1) it misstated the law to require that the income embezzled must have been reported as income, (2) even assuming the instruction correctly stated the law, it improperly placed the burden on appellant to show that the income had been reported, and (3) it required the jury to make a legal conclusion as to whether receipts should have been reported as part of gross income. We find these arguments to be without merit.

Appellant sustained the embezzlement losses in the years 1965 through 1968. His secretaries accomplished the embezzlement by keeping for themselves cash payments to the appellant for medical services rendered. He never actually received these payments nor did he ever report them as income. Appellant did not discover these embezzlement losses until 1969 and 1971.

 Because of the secretive nature of embezzlement, embezzlement losses generally may be deducted in the year in which they are discovered. *Alison v. United States*, 344 U.S. 167, 73 S.Ct. 191, 97 L.Ed. 186 (1952). The taxpayer may not deduct, however, the loss of income which is embezzled before the taxpayer actually receives the income and which is never reported as income. *Alsop v. Commissioner*, 290 F.2d 726 (2d Cir. 1961). To permit such a deduction would give appellant a double tax benefit. He would be relieved from paying tax on the amount when it was abortedly given to him and would also be excused from paying tax on that amount of income which is offset by the loss in the year the loss is discovered. The statement of law concerning the timeliness of a deduction for embezzlement loss was correct. The fee that is filched before the doctor reports it for tax purposes no more generates a loss deduction than does a stillborn calf for a cash basis rancher.

 Contrary to appellant's second argument, the instruction does place the burden on the government to show that the receipts were not reported. It requires the government to prove satisfactorily that the funds embezzled should have been and were not reported as income.

 We need not reach the merits of appellant's third contention that the instruction calls for a legal judgment on the part of the jury. By failing to state this ground for his objection to the instruction, appellant has waived this point on appeal. Fed.R.Civ.P. 51. In reviewing jury instructions we are confined to the errors raised below in the trial court. *Lienemann v. State Farm Mutual Auto Fire and Casualty Co.*, 540 F.2d 333 (8th Cir. 1976); *cf. Bock v. United States*, 375 F.2d 479 (9th Cir. 1967).

We remand for an evidentiary hearing on the question of whether appellant's attorney-client privilege was breached and if so, whether the breach deprived appellant of any Fifth or Sixth Amendment right. In all other respects the judgment of the trial court is affirmed.

Affirmed in part and reversed in part.